IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RACHEL A. STALLWORTH,
   Plaintiff,

vs.            Case No. 3:12cv2/MCR/EMT

THE UNITED STATES AIR FORCE and
ERIC K. FANNING, in his official capacity
as Secretary of the United States Air Force,
   Defendants.
_____/

## REPORT AND RECOMMENDATION

   Plaintiff Rachel A. Stallworth ("Stallworth") initiated this employment discrimination action by filing a complaint under 42 U.S.C. § 2000e, *et seq*. (Title VII of the Civil Rights Act of 1964) (doc. 1).  Although Plaintiff was represented by counsel at the initiation of this action, counsel moved to withdraw on May 29, 2014 (doc. 41), and the motion was granted on June 6, 2014 (doc. 46).  Plaintiff subsequently filed a notice of appearance pro se on June 25, 2014 (doc. 47).[1]  On July 3, 2014, Defendant, Eric K. Fanning, as Secretary of the United States Department of the Air Force, filed the motion for summary judgment (docs. 50, 51) that is the subject of this Report and Recommendation.  On July 7, 2014, Plaintiff responded to the motion (doc. 54) and, after the court subsequently issued an advisory order (doc. 55) explaining summary judgment procedures and affording Plaintiff a second opportunity to respond, Plaintiff file a second response (doc. 66) on September 3, 2014.

---

[1] After filing the notice of appearance pro se, and while the case was undergoing mediation, Plaintiff filed a motion for the appointment of counsel (doc. 57).  Upon review of the motion, the court requested that Plaintiff file an application to proceed in forma pauperis so that it could be determined whether Plaintiff qualified as indigent (doc. 58).  Plaintiff complied (doc. 59), and upon review of the application the court determined that Plaintiff did not qualify as an indigent.  The motion for appointment of counsel was therefore denied (doc. 64).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(E); *see also* 28 U.S.C. § 636(b)(1)(B), (C). Upon review of the parties' submissions, it is the opinion of the undersigned that the motion to for summary judgment should be granted.

I.  BACKGROUND[2]

On September 10, 2008, Plaintiff was hired as a clerk for the 46th Maintenance Operations Squadron ("MOS") at Elgin Air Force Base, Florida, as part of the Student Temporary Employment Program ("STEP") (doc. 51 at ¶1). Under the terms of this program, the appointment may not extend beyond one year, but appointees can be converted to the Student Career Experience Program ("SCEP"). Plaintiff was in fact converted to SCEP status on August 2, 2009 (*id.* at ¶3). SCEP appointees may be "noncompetitively" converted into a career position after the appointee completes her educational program and has satisfactorily completed 640 hours of career work experience (doc. 51-11). On February 9, 2011, before Plaintiff would have become eligible for conversion into a career position, she was terminated (doc. 51 at ¶4).

Upon her entry into SCEP, Plaintiff first worked as a Commander's Secretary for Major Brian Crum, with whom there were apparently no problems, and then she began working in the same capacity for Lawrence Wager in July of 2009 (doc. 51 at ¶¶23–25).

Plaintiff related an incident that occurred in May or June of 2009 involving Master Sergeant Marbris Dillard and herself. Apparently the two were in the same room or office, and when Plaintiff was walking out of the office, Dillard told Plaintiff that she had "the biggest ass he's ever seen," and then either attempted to swat or imitated swatting Plaintiff on the behind (doc. 51 at ¶¶27–28; doc. 51-1 at 54–55, 61). Plaintiff blocked his hand with her own, which resulted in Dillard swatting her hand instead (doc. 51-1 at 54). Plaintiff told Dillard to meet her downstairs to talk about the incident, whereupon Dillard apologized and said he would "never disrespect" her (doc. 51-1 at 55, 62). Plaintiff told Dillard, "I don't play like that," and then considered the incident "over with" (doc. 51-1 at 54–55). Plaintiff did not consider the incident to be offensive or to be sexual

---

[2] Because this case comes before the court on Defendant Fanning's motion for summary judgment, the court views the facts in a light most favorable to Plaintiff as the non-moving party, *see* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993), drawing those facts from the pleadings and other evidentiary materials on file.

Case No: 3:12cv2/MCR/EMT

harassment and thought he was "just kidding around, basically" (doc. 51-1 at 55, 62). As Plaintiff further explained in her 2014 deposition:

> The incident is sexual harassment, but I did not consider him to be -- you know what I mean? What I'm saying is, I had all this stuff going on with the school board, filing the discrimination with the school board, had just been chased out of the doctor [sic] by a white doctor, using racial slurs, you know. I fell, hurt my arm, my hip and everything, telling me that, you know -- and then I get this right here. I didn't want no more trouble on my job, and then I'm put in the middle of this right here. I didn't want no trouble at Eglin Air Force Base. I wasn't trying to have no sexual harassment claim. This man had apologized to me. You know what I'm saying?[3]

(doc. 51-1 at 62–63).

In August of 2009, Dillard evidently contacted Colonel Glenn Ferguson,[4] stating that, when he was on a four to six-week training course at Gunter Air Force Base in Alabama, Plaintiff contacted him one morning on his personal cell phone, leaving several text messages that indicated she wanted to speak with him (doc. 51-13, Declaration of Glenn Ferguson at 3). Dillard did not speak with her, however. Dillard further explained to Ferguson that he had been working closely with Plaintiff while at Eglin and that he believed he was being sexually harassed by her (*id.*). Dillard's contact with Ferguson occurred on a Saturday, and on the following Monday Dillard returned to Eglin and cleaned out his office because he had a "follow on assignment to another unit" at Eglin (*id.*). On that same Monday, Plaintiff had sent an email message to Major Michael Monfalcone at Eglin stating that Dillard had sexually harassed her (*id.*). Then, "[b]ecause of the apparent conflicting dual allegations," Ferguson directed Major Monfalcone to initiate a commander directed investigation ("CDI"), and Monfalcone in turn appointed Captain Kathleen Sullivan to conduct the CDI (*id.* at 3–4).

Plaintiff stated that she was called in for an interview with Sullivan regarding the CDI, but at the time neither Sullivan nor Wager informed her that she was a suspect in the investigation (doc.

---

[3] In this passage Plaintiff refers to a lawsuit or possible lawsuit based on sexual or racial harassment against the school board of Okaloosa County, Florida, that was underway at the time of the incident with Dillard. *See* doc. 51-1 at 44–46.

[4] Apparently out of confidentiality or privacy concerns, Ferguson did not reveal Dillard's identity. Plaintiff, however, verified that it was Dillard who was the subject of the sexual harassment investigation that would follow. *See* doc. 51-1 at 112–13.

66 at 10; doc. 51-1 at 180). During the interview Sullivan began asking Plaintiff questions about whether she had had an affair or had spent the weekend with Dillard while Dillard was in Alabama. Plaintiff stated that she had not, and at some point during the interview, Sullivan informed Plaintiff she was in fact under investigation and read Plaintiff her "Miranda rights" (doc. 51-1 at 181).[5] Plaintiff asserted that, had she known she was a suspect in the CDI, she "would have never even talked to anyone in the first place" (doc. 51-1 at 181).

Although she stated she did not know why, Plaintiff came to understand that the CDI was also concerned with harassment that might have occurred against Dillard's wife and that she was suspected (doc. 51-1 at 57; doc. 51-14 at 3). Plaintiff knew Mrs. Dillard separate from her involvement with the Air Force because Mrs. Dillard worked at an optometrist facility where Plaintiff was a customer or patient (doc. 51-16 at 3). Plaintiff also came to understand that Master Sergeant Phylisa McCarthy was also involved in the investigation. It would appear that at least part of the focus of the CDI was upon the rumor that Sergeant McCarthy might be having an affair with Dillard and the separate rumor that Plaintiff might also be having an affair with Dillard (doc. 51-16 at 3–6). As the investigation was ongoing, Plaintiff received a memorandum from Wager directing that she have no contact or communication with either Dillard or his wife or with Sergeant McCarthy (doc. 51-17). Plaintiff states that during this time she was asked if she wanted to pursue sexual harassment charges against Dillard, but she declined (doc. 51-1 at 112). She did report the incident to Captain Sullivan, however (doc. 51-1 at 56).

Also during the investigation, Plaintiff stated that information regarding the CDI and the fact that she was involved in it became common knowledge within the 46th MOS, even though she was under the impression that the information was supposed to be confidential (doc 51-1 at 78, 83). Plaintiff identified Sergeant McCarthy and Sergeant Mark Murphy as those who were tasked with managing the CDI documents and stated that Murphy, who at the time was the acting first sergeant, would leave papers from the CDI out on the top of the desk in the office he was using (*id.* at 83–84). Plaintiff therefore concluded that Murphy was the one responsible for the dissemination of the

---

[5] Plaintiff specifically referenced the term "Miranda rights" and then identified in particular that she was informed of her right to remain silent (doc. 51-1 at 181–82).

Case No: 3:12cv2/MCR/EMT

information (*id.* at 83). Plaintiff found it embarrassing that others around her knew her "to be involved in something so intimate and so personal" (doc. 51-1 at 76).

After a forty-five day investigation, Captain Sullivan determined that none of the allegations in the CDI could be substantiated (doc. 51-13 at 4). Accordingly, the CDI investigation was ended in October of 2009, and the "no contact" order was lifted (doc. 51-15).

Plaintiff stated that, after information about the CDI had spread around the office, she noticed others acting more negatively toward her, and she believed Wager had caused the other employees to "turn against" her (doc 51-14 at 6). She stated that "nobody was friendly" after the CDI, that sometimes others would mock her and refer to her as "crazy," and that she felt like she was being excessively monitored at the workplace (doc. 51-1 at 77, 83). As for Wager himself, Plaintiff stated that he limited her duties and made her feel incompetent (*id.* at 76–77). Wager would also talk to her in a "mean tone," and he would walk around her desk to talk to her "and impede [her] from being able to, you know, move about -- be[ing] able to get up and move" (doc. 51-1 at 76). Plaintiff similarly related that Murphy once stood over her and aggressively pointed his finger while yelling at her (*id.* at 82).[6] Murphy also referred to her as a "fatal attraction" (*id.*).

In the aftermath of the CDI, Plaintiff found it stressful to remain in the same work environment, particularly because she perceived that others knew the sexual details of her alleged affair with Dillard (doc. 51-1 at 76).[7] Plaintiff informed Wager that she wanted to transfer out of the 46th MOS, but Wager was resistant (*id.* at 77). In March of 2010, however, Colonel Ferguson reassigned Plaintiff to the 46th Maintenance Squadron, Precision Metrology Equipment Laboratory ("PMEL") as an office automation assistant, and under a different supervisor, John Moreland (doc. 51-13 at 5).

---

[6] Plaintiff does not appear to relate what either Wager or Murphy talked to her about during these confrontations.

[7] While Plaintiff references "sexual details," there is no indication as to what those details were, graphic or otherwise, whether Plaintiff overheard specific conversations about them, or whether she simply concluded that others must have been discussing the matter based on their actions toward her. The record does show that during the CDI Plaintiff was asked certain questions such as whether she had asked Dillard to meet her "behind the Niceville Kmart" or whether she had ever touched Dillard inappropriately (doc. 51-16 at 6; 66-1 at 6).

The new assignment, which was intended to be temporary, lasted from March 2010 until July 2010 (doc. 51-1 at 86).  Plaintiff stated that, while it was indicated to her that she would continue to perform secretarial duties, she was unsure as to what her actual title was, and her actual duties were minimal (doc. 51-1 at 101–04).  Plaintiff also stated that, for a time, her new desk was in the back of the office area, in a corner where it was dark (*id.* at 92).  She described this as a "Rosa Parks" experience, "kind of like walking to the back of the bus" (*id.*).

Plaintiff stated that she began to have problems with Moreland who "was always licking his tongue out like he wanted to have sex with [her]" (doc. 51-1 at 86–87).  Plaintiff states she informed Chief Master Sergeant Kenneth Trawick, Cassandra Williams, and the Military Police about this, but to her knowledge nothing was done about the situation, and Moreland's behavior continued (*id.* at 88–90).  Plaintiff also described an incident while working at PMEL where another employee, Will Andrews, who while working on the computer at Plaintiff's desk reached down to check a plug and put his hand on her thigh.  Plaintiff told him "if he ever touched me again, I was going to break his jaw" (doc. 51-1 at 87).  Plaintiff reported the incident to Sergeant Trawick and Cassandra Williams but did not see any results from her report (*id.* at 88).

Plaintiff asked to be transferred out of the 46th altogether; in July of 2010, she was transferred but to the 46th Test Systems Squadron ("TSS"), which was apparently also known as the "maintenance group" or the "range group" (doc. 51-1 at 119–20).  Plaintiff was assigned to be an assistant to Beth-Anne Woods (*id.* at 121–22).  At Plaintiff's initial meeting with Woods, Woods asked Plaintiff about the alleged affair she had with Dillard and referred to her as a "cougar" (*id.*).  Plaintiff was not offended at the remark at the time because she did not know what it meant, but later when she learned it meant an older woman who liked younger men, she became offended (*id.* at 122–23).  When responding to Woods' question about Dillard, Plaintiff provided that they were good friends and that she prayed for Dillard and his wife because, evidently, they were having difficulty having a baby (*id.*).  Woods responded that she "heard they had a little Oreo baby" (*id.* at 123).  Plaintiff was not offended by the term "Oreo baby" because "you hear it all the time" (*id.* at 124).  Plaintiff asserted that Woods also at that time referred to black or mixed race children as "porch monkeys" (*id.* at 147–48).  Plaintiff found the use of that term to be racially discriminatory (*id.* at 148).  Also, Plaintiff states that Woods once commented to an unidentified third party, "Why do you black women pull each other down so much?  It must be because of your culture." (*id.* at

145–46).  Although Plaintiff was unsure of the context, she thought the comment was in reference to Plaintiff's earlier difficulties when working at the 46th MOS (*id.* at 146).  Plaintiff said she only told "the union" about the above comments made by Woods because she felt there was nobody else she could report them to (*id.* at 146–48).

Plaintiff stated that, where she was used to getting positive evaluations of her job performance, following the CDI her performance ratings began to falter.  For instance, Plaintiff describes an evaluation given to her by Wager who "gave me a three for, like, communicating, saying that I didn't engage with my workers, even though I was getting -- I had been getting, like, sevens and eights, like, in the communication part.  He gave me, like, a three" (doc. 51-1 at 77–78; *see also* doc. 51-13 at 4).

Additionally, there were episodes in which Plaintiff's behavior became loud and disruptive.  In one instance occurring on February 25, 2010, Sergeant Murphy observed Wager greeting Plaintiff at her desk, but Plaintiff appeared to purposely ignore him; and in another instance occurring on March 2, 2010, Murphy observed Wager similarly speak to Plaintiff and Plaintiff then yelled at Wager and would not cease until he left the office (doc. 51-24; *see also* doc. 51-13 at 4).  Regarding her behavior, Wager held a March 9, 2010, counseling session with Plaintiff in the presence of two others, wherein Plaintiff once again became disruptive and loud and informed Wager that she did not need to follow any direction from him (doc. 51-13 at 4; doc. 51-25 at 3).  After meeting with other personnel officials and considering stronger consequences, Colonel Ferguson concluded that Plaintiff should be suspended for one day "instead of the more severe 'severance' option" (doc. 51-13 at 4).  In so deciding, Ferguson recognized that a factor in Plaintiff's behavior might have been stress caused by her involvement in the recent CDI investigation (*id.* at 5).

Plaintiff's performance difficulties persisted during her employment at the 46th TSS.  In a "feedback session" with Plaintiff on November 10, 2010, Woods talked with Plaintiff about her lack of attention to details, particularly with reference to "letters of appointment" that she drafted that were "grossly in error" (doc. 51-38 at 1).  Woods also mentioned that several other office workers had complained about Plaintiff's mumbling and her "suspicious nature" which caused others to be leery about interacting with her.  Plaintiff did express her belief that others in the office were spying on her and that "everyone is out to get her" (*id.* at 1–2).

Woods also described ongoing issues Plaintiff had with "Workflow Taskers" and other elements of Plaintiff's payroll duties which resulted in payment errors to employees (doc. 51-31 at 4). Further, Plaintiff "failed to understand how to correct the errors or correctly enter the data even after being provided step-by-step instructions on several occasions," and "[t]hese mistakes caused so many complaints and confusion that [Woods] decided to reassign timekeeper duties to others" (*id.*).

Similar difficulties arose with Plaintiff's other administrative duties such as performing "recall roster" tasks, with Plaintiff continually found to be forgetful, repeating typographic or formatting errors, and paying insufficient attention to details (*id.*; doc. 51-30). Because of this accumulation of errors, Woods sent Plaintiff a notice of termination on February 2, 2011, for her "fail[ure] to demonstrate the qualities and characteristics essential to effective performance as a federal career employee" (doc. 51-30 at ¶4). Also cited within the notice were Plaintiff's difficulties "keeping personal issues out of the center" (*id*. at ¶3.c.). Further, the notice states, "[i]nstead of taking these recommendations as tools to assist you in making needed improvement, you have consistently taken a defensive posture accusing co-workers and others of unfounded personal vendettas against you" (*id.*).

Plaintiff filed an Equal Employment Opportunity ("EEOC") complaint on May 26, 2010, alleging that she received discriminatory treatment based on her age and color while at the 46th MOS (doc. 51-2). The complaint identified the harassment-type actions taken by Wager as detailed *supra*, plus certain administrative actions Wager took such as not considering Plaintiff for a certain job but considering a younger employee (*id.* at 4). The complaint identified incidents occurring from August 2009 to March 2010, and was also amended on November 22, 2010, to include the one-day suspension she received from Colonel Ferguson, and adding race and gender as bases for discrimination, as well as a claim of retaliation for having filed the EEOC complaint (doc. 51-3). Plaintiff states that a mediation of her discrimination claim was scheduled, but that she was terminated from her job two days prior (doc. 51-1 at 153; doc 51-36 at 2).

After her termination, Plaintiff appealed to the Merit Systems Protection Board, but on March 18, 2011, the appeal was dismissed on Plaintiff's motion (docs. 51-5, 51-6). On April 2, 2011, Plaintiff filed a second EEOC complaint, alleging both discrimination and a hostile work environment based on race, color, age, and reprisal (doc. 51-7 at 3). Where her first EEOC

complaint concerned actions taken by Wager, the second complaint targeted actions taken by Woods, including Plaintiff's termination (*id.* at 3–4).

On September 28, 2011, Plaintiff's first EEOC complaint was evidently dismissed (doc. 51 at 3).[8] On January 3, 2012, Plaintiff filed the instant Title VII complaint in this court, and on account of this filing, Plaintiff's second EEOC complaint was dismissed on May 25, 2012, as a procedural matter for lack of jurisdiction (doc. 51-8).

In her Title VII complaint (doc. 1), Plaintiff claims harassment in the form of a hostile work environment at her workplace and wrongful termination in retaliation for her filing an EEOC complaint. Plaintiff seeks injunctive relief to correct the harassment, compensatory damages including for emotional turmoil and the related medical and therapeutic expenses, punitive damages, attorney's fees and costs.

## II.   SUMMARY JUDGMENT STANDARDS

In order to prevail on the motion for summary judgment, Defendant must show that Plaintiff has no evidence to support her case, or present affirmative evidence to show that Plaintiff will be unable to prove her case at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2553–54, 91 L. Ed. 2d 265 (1986). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." *Id.*; *accord* Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). Further, the non-moving party must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). A mere "scintilla" of evidence or conclusory allegations are insufficient. Celotex Corp., 477 U.S. at 324 (quoting Fed. R. Civ. P. 56). Plaintiff must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 "requires

---

[8] Though Defendant asserts this as a Statement of Fact, there does not appear to be any written opinion or other evidence of this decision within the record.

the nonmoving party to go beyond the pleading and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'") (quoting Celotex Corp., 477 U.S. at 324 (quoting former Fed. R. Civ. P. 56(c), (e))); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994). Evidence presented in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to Plaintiff. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999). However, "[w]here the factual context renders the non-moving party's position implausible, it must come up with more persuasive evidence than would otherwise be necessary to defeat summary judgment." In re Financial Federated Title and Trust, Inc., 347 F.3d 880, 885 (11th Cir. 2003) (citing Matsushita, 475 U.S. at 587, 106 S. Ct. at 1348); *see also* Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742–43 (11th Cir. 1996) ("A court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible). A motion for summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322.

III.   DISCUSSION

    A.  Harassment Claim

Although Title VII was originally applied to discriminatory actions taken with regard to specific employment decisions that affect the terms or conditions of employment, the Supreme Court has made it clear that Title VII may also be violated by harassment in the workplace that is so severe or pervasive so as to likewise alter the conditions of the victim's employment and create an abusive working environment. Faragher v. City of Boca Raton, 524 U.S. 775, 786, 118 S. Ct. 2275, 2282 (1998) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405–06, 91 L. Ed. 2d 49 (1986)). To establish a hostile environment claim of sexual harassment, the employee must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently

severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

Gupta v. Florida Bd. of Regents, 212 F.3d 571, 582 (11th Cir. 2000)

As the Eleventh Circuit recognized, it is the fourth element, the question of severity or pervasiveness, that "tests the mettle of most sexual harassment claims." *Id.* at 583. To meet this element, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 788, 118 S. Ct. at 2283. Courts are to consider the circumstances as a whole, including the frequency of the conduct in question and whether it might be physically threatening or humiliating, such that it unreasonably interferes with the employee's ability to work. *Id.* at 788–89, 118 S. Ct. at 2283. In doing so, courts must be mindful that "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Id.* at 788, 118 S. Ct. at 2283–84 (quotation omitted). Thus, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'" and therefore do not amount to Title VII violations. *Id.* at 788, 118 S. Ct. at 2283 (citations omitted).

Accordingly, courts have found allegations involving flirtatious behaviors, personal solicitations or invitations to date, and offhand sexual jokes or remarks to be insufficient. *See* Gupta, 212 F.3d at 583–84. Likewise, occasional incidents of inappropriate physical contact such as touching of the hips or buttocks does not amount to sexual harassment. *See, e.g.*, Mendoza v. Borden, Inc., 195 F.3d 1238, 1247 (11th Cir. 1999) (manager rubbing hips against employee's hip while touching her shoulder and smiling insufficient); Dar Dar v. Associated Outdoor Club, Inc., 248 F. App'x 82, 85–86 (11th Cir. 2007) (unpublished) (two sexually inappropriate comments and two incidents of intentional buttocks touching over the course of 22 months insufficient)[9]; Hill v. Guyoungtech USA, Inc., No. Civ A 07-0750-KD-M, 2008 WL 4073638, at *9 (S.D. Ala. Aug. 26, 2008) (slap on the buttocks while employee was picking something up off of the floor insufficient).

---

[9] The undersigned cites Dar Dar and other unpublished cases herein only as persuasive authority and recognizes that such opinions are not considered binding precedent. *See* U.S. Ct. of App. 11th Cir. Rule 36-2. The undersigned does the same with respect to opinions of circuit courts of appeals other than the Eleventh Circuit and district court opinions cited herein.

The Eleventh Circuit in Mendoza found it helpful to survey decisions throughout the circuits to help arrive at a "minimum level of severity or pervasiveness" that would constitute harassment under Title VII, and this court finds the survey of decisions helpful as well.  The Eleventh Circuit identified the following cases:

> Shepherd v. Comptroller of Public Accounts of Texas, 168 F.3d 871, 872–75 (5th Cir. 1999) (holding that several incidents over a two-year period, including comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support hostile-environment claim); Indest v. Freeman Decorating, Inc., 164 F.3d 258, 264–67 (5th Cir. 1999) (noting it was "dubious" whether several sexually oriented comments and gestures and an implied threat of retaliation for refusing a sexual advance would be sufficient to establish a hostile environment); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998) (holding that statement that plaintiff had the "sleekest ass" in office plus single incident of "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of the plaintiff's employment); Adusumilli v. City of Chicago, 164 F.3d 353, 357 (7th Cir. 1998) (holding actions insufficient to support hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1365–66 (10th Cir. 1997) (holding five "sexually-oriented, offensive" statements over sixteen months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can"); Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1167–68 (7th Cir. 1996) (holding offensive comments including repeatedly calling the plaintiff a "sick bitch" insufficient under Harris [v. Forklift Systems, Inc., 510 U.S. 17 (1993)] because not necessarily gender-related); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753–54 (4th Cir. 1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII); Black v. Zaring Homes, Inc., 104 F.3d 822, 823–24 (6th Cir. 1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, there's "Nothing I like more in the morning than sticky buns"; suggesting land area be named as "Titsville" or "Twin Peaks"; asking plaintiff, "Say, weren't you there [at a biker bar] Saturday night dancing on the tables?"; stating, "Just get the broad to sign it"; telling plaintiff she was "paid great

money for a woman"; laughing when plaintiff mentioned the name of Dr. Paul Busam, apparently pronounced as "bosom"); Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995) (holding insufficiently severe or pervasive to support a hostile-environment claim nine instances of offensive behavior over seven months including repeated references to plaintiff as a "tilly" and a "pretty girl" and one instance of simulated masturbation); Kidwai v. McDonald's Corp., No. 93-1720, 1994 WL 136971 (4th Cir. 1994) (holding insufficient under Harris seven incidents, including one instance in which harasser asked plaintiff whether "she was in bed with someone"); Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333, 337 (7th Cir. 1993) (holding plaintiff's claims—supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work—were not sufficient for actionable sexual harassment); *see also* DeAngelis v. El Paso Mun. Police Officers Ass'n, 51 F.3d 591, 593 (5th Cir. 1995) ("A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace."); Indest v. Freeman Decorating, Inc., 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.").

Mendoza, 195 F.3d at 1246–47. The Mendoza court assessed these cases as containing allegations that were either as serious or more serious than the allegations that were currently before the court. *Id.* at 1246. Before the Mendoza court was "evidence of four categories of harassing conduct: (1) one instance in which Page [the supervisor] said to Mendoza [the employee] 'I'm getting fired up'; (2) one occasion in which Page rubbed his hip against Mendoza's hip while touching her shoulder and smiling; (3) two instances in which Page made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) Page's 'constant' following and staring at Mendoza in a 'very obvious fashion.'" *Id.* at 1247. The court found these allegations to "fall[] well short" of the required standards of severe or pervasive actions. *Id.*

Likewise, this court finds Plaintiff's allegations and evidence to be short of the standard. The mainframe of Plaintiff's allegations concern two incidents of physical contact, plus recurring issues with teasing, rumors, sexual innuendo, and general meanness or aggression. As for the physical contact, Dillard's lone attempt to slap Plaintiff's behind falls right in line with what Mendoza found legally insufficient. Moreover, Plaintiff herself found the incident not so egregious as to cause her

to declare it to be sexually harassing at the time.[10]  And, of course, it does bear mentioning that Dillard did not actually slap her behind, though that may be a result of Plaintiff's blocking his hand. The only other episode involving physical contact is the incident where Will Andrews touched Plaintiff's thigh while working on her computer.  These two incidents, taking place as they did over a span of approximately one year, could hardly constitute the sort of pervasive conduct necessary to establish a sexually abusive working environment.

Of course, Plaintiff adds allegations that: (1) she was subjected to accusations of sexual harassment against Dillard; (2) sexual details regarding the alleged harassment, derived from her alleged affair or attempted affair with Dillard, became known around the workplace; and (3) as a result of the CDI, fellow employees began to "turn against" her, shun her, be unfriendly to her, and refer to her as crazy, a "fatal attraction," and a "cougar"; and her supervisors were mean to her, excessively monitored her, and controlled her environment.  The court finds many of these allegations to be generalized and vague, without evidentiary support beyond Plaintiff's own bare assertions that they occurred.  Chandler v. Volunteers of America, North Alabama, Inc., No. 14–10050, 2015 WL 329596, at *10 (11th Cir. Jan. 27, 2015) (unpublished) (holding that courts should not rely upon evidence of statements made when no context is provided for the statement, nor how it was made or whether the employee heard it directly or learned about it later); Edwards v. Wallace Comm'ty College, 49 F.3d 1517, 1522 (11th Cir. 1995) (same).  Even so, these allegations depict a general lack of civility in the workplace that might be unpleasant but do not form a suitable basis for a sexual harassment claim.  In fact, much of the behavior is non-sexual or only tangentially sexual.  Personal animosities and generally boorish behaviors that do not relate to the employee's sex or sexuality do not qualify as sexual harassment.  Gupta, 212 F.3d at 583.  This is true even of Plaintiff's complaint that others passed around the content of the CDI or rumors about Plaintiff's supposed affair with Dillard.  Even though the CDI might have pertained to sexual matters, it is difficult to find that the dissemination of these details, be it contrary to the agency's

---

[10]  Although Defendant represents that Plaintiff flatly rejected the incident as amounting to harassment, the court recognizes that, as Plaintiff provided in earlier deposition testimony, at least part of the reason she did not pursue any allegations of sexual harassment at the time was out of concern for her other ongoing sexual harassment matter with the school board.  Thus, Plaintiff's considerations about the incident and whether they amounted to harassment were certainly more nuanced than Defendant makes them out to be, and for this reason the court declines Defendant's invitation to strike the allegations in the complaint as contradicting the record evidence in this case.

rules of confidentiality or not, would constitute an act of sexual harassment. To do so would be to strike fear into any management team that, by the very act of investigating into sexual misconduct, they might themselves be found to have committed sexual misconduct. A bona fide investigation into matters of sexual harassment should not itself engender sexual harassment.

Finally, there is the matter of Moreland's alleged lip-licking. This allegation at least superficially merits separate discussion because it seems to be the one action or behavior that was tangibly sexual and somewhat pervasive— if Plaintiff is to be taken at her word when she states in the most general of terms that it happened "all the time." Even so, the court finds this type of behavior to be little different from the "constant following and staring . . . in a very obvious fashion" from the supervisor in Mendoza, the attempts to look down the employee's dress in Shepherd, or the repetitive behavior of putting a hand on the employee's shoulder in Weiss, *supra*. As such, the court finds Moreland's lip-licking to be the sort of flirtatious behavior or sexual "remark" that falls short of sexual harassment. "We cannot mandate that 'an employer [ ] be required under pain of legal sanctions to ensure that supervisors never look or stare at a subordinate whom they are supervising in such a way that she might think they are 'coming on' to her.'" Gupta, 212 F.3d at 585 (quoting Mendoza, 195 F.3d at 1256 (Carnes, J., concurring))).

Next, Plaintiff also alleges she was harassed on the basis of her race or color. Similar to claims involving sexual harassment, for a successful harassment claim based on a racially hostile work environment claim Plaintiff must show: "(1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee . . . ; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." McCann v. Tillman, 526 F.3d 1370, 1378 (11th Cir. 2008) (quoting Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002)). Likewise, courts should view all the circumstances, paying attention to the frequency of the conduct as well as the severity, and whether the conduct "unreasonably interferes with an employee's work performance." *Id.* (quotations omitted). Sporadic or isolated instances are not sufficient to establish a pervasive environment so as to alter the terms of one's employment. *Id.* Thus,

> Mere utterance of an . . . epithet which engenders offensive feelings in a employee, does not sufficiently affect the conditions of employment to implicate Title VII.

Case No: 3:12cv2/MCR/EMT

>   Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Harris v. Forklift Systems, Inc., 510 U.S. 17, 21–22, 114 S. Ct. 367, 370 (1993) (quotation omitted).  When race-based or harassing statements are not directed toward the employee, they should be viewed as less severe.  Chandler, 2015 WL 329596, at *10 (citing Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1254–57 (11th Cir. 2014)).

In keeping with these standards, the Eleventh Circuit has found against harassment when the claim involves only isolated instances where racially offensive language was used.  *See* Singleton v. Auburn Univ. Montgomery, 520 F. App'x 844, 848 (11th Cir. 2013) (unpublished) (where black employee was referred to as a "Do Boy," was told "it's sad because of your color you need to . . . watch your back," was told that his supervisor had commented that he would take care of [employee's] ass, and learned that a black co-employee was referred to as a "n_____," comments were not pervasive enough to amount to racial harassment); Brooks v. Hyundai Motor Mfg. Ala., LLC, 444 F. App'x 385 (11th Cir. 2011) (unpublished) (no racially hostile work environment where black employee's team leader on more than one occasion said "you black folks" or "n____," and employee testified they did not adversely affect her job performance); Alexander v. Opelika City Schools, 352 F. App'x 390, 393 (11th Cir. 2009) (unpublished) (no racial harassment where employee was called "boy" eight times over a span of two years and his supervisor discussed how to tie a noose around a person's neck, though comments were not directed toward employee and employee did not know whether comments were made in regard to African Americans); McCann v. Tillman, 526 F.3d 1370, 1378–79 (11th Cir. 2008) (white employees calling a black female employee "girl," two black male employees "boys," and another black female employee a "n_____ bitch" over an extended period of time did not amount to racial harassment).

In the instant case, Plaintiff's focus is upon her time at the 46th TSS and Woods' use of the terms "Oreo baby" and "porch monkey," the former of which Plaintiff did not regard as offensive and the latter of which Plaintiff did.  The comments were not directed at Plaintiff but were used to describe children, and in particular the baby born to Dillard and his wife.  Plaintiff also alleges that Woods asked another person why "black women pull each other down so much?" and commented

that it "must be because of their culture," and that these comments were possibly about Plaintiff because they might have referred to Plaintiff's alleged affair with Dillard. None of the comments were included in either of Plaintiff's EEOC complaints.[11]

Woods' comments, while of a derogatory nature, did not create a pervasive atmosphere any more than the cases cited above where no racial harassment was found. It is indeed questionable that any of the comments were even directed at Plaintiff, and none were alleged to have been delivered in a threatening manner. Rather, the comments were casual, offhand remarks, which were isolated and unrelated to Plaintiff's work. What is more, the record evidence tends to show that Plaintiff did not even perceive them as offensive, or at least offensive enough to be actionable in her EEOC complaint. The comments may have been neither professional nor respectful, but they do not qualify as pervasive or severe under the standard.

Beyond the comments, Plaintiff also complained that when her desk was relocated to a back corner of the office, it felt like a "Rosa Parks experience." Other than Plaintiff's subjective perception of the relocation, however, there is nothing objectively in the record to suggest that the move was made on account of her race or color, or for that matter, as a way to harass her. Plaintiff's subjective impression is a matter of personal conjecture and therefore insufficient to support her claim. *See, e.g.,* Splunge v. Shoney's, Inc., 874 F. Supp. 1258, 1271 (M.D. Ala. 1994); Gomez v. Metro Dade County, Fla., 801 F. Supp. 674, 681 (S.D. Fla. 1992).

B.  Retaliation Claim

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was some causal relation between the two events. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. *Id.* If that burden is met, the plaintiff then bears the ultimate burden of proving,

---

[11] While Plaintiff asserted that she did in fact report these statements to the EEOC investigator who then independently elected not to include them in the initial complaint, Plaintiff had the opportunity to include the comments in her own 23-page summary of allegations and failed to do so, other than what might amount to a tangential reference to Woods' "pull each other down" comment (doc. 51-1 at 154–55; doc. 51-37 at 7).

by a preponderance of the evidence, that the reason provided by the employer is a pretext for prohibited, retaliatory conduct. *Id.*

As Plaintiff was engaged in protected activity through the filing of her EEOC complaints, she has satisfied the first prong of the prima facie standard. E.E.O.C. v. Total Sys. Serv., Inc., 221 F.3d 1171, 1174 & n.2 (11th Cir. 2000). Further, because she was terminated, she clearly suffered an adverse employment action.

As for the third prong, for Plaintiff to establish a causal connection, she need only show "that the protected activity and the adverse action were not wholly unrelated." Simmons v. Camden County Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985). "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action. The defendant's awareness of the protected statement, however, may be established by circumstantial evidence." Clover v. Total System Services, Inc., 176 F.3d 1346, 1354 (11th Cir. 1999) (quotation omitted). Nonetheless, there has to be some temporal proximity between the defendant's knowledge and the adverse action. Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004). While a period as much as one month between the protected activity and the adverse action is not too attenuated, a three to four-month disparity would be insufficient to show the required causal connection. *Id.* (citing Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001)). Therefore, "[i]f there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Id.*

In the instant case, it is not entirely certain as to when Woods learned of Plaintiff's EEOC filings. It is difficult to determine precisely when Woods must have known about the first EEOC complaint being filed.[12] Plaintiff does not provide a definitive date. Defendant asserts that, because Plaintiff filed her EEOC complaint on May 26, 2010, and she was terminated on February 2, 2011, the time span is far too protracted to draw a causal connection as a matter of law. However, this overlooks the fact that Plaintiff amended her complaint on November 22, 2010, which reduces the delay to a little more than two months, which is within the bounds of proximity—or at least within

---

[12] Because Plaintiff's second EEOC complaint was not filed until after her termination, it is obvious that the first EEOC complaint is the only possible candidate to form the basis for a causal connection.

the grey area in between. Furthermore, Plaintiff indicates that a mediation, ostensibly in relation to her EEOC complaint was scheduled, as it turned out, on the second day after she was terminated. Recognizing the lightness of Plaintiff's burden as to this prong of the standard, the court will draw the inference in Plaintiff's favor that, at least as far as the sequence of events, there was a causal connection.

In the next step of the analysis, Defendant has the burden of articulating a legitimate reason for terminating Plaintiff's employment. Defendant amply meets this burden. Defendant has documented several reasons for Plaintiff's termination, such as her commission of gross errors in payroll and other personnel matters, her lack of attention to details, her apparent unwillingness to act on suggestions at improvement, and her disruptive behavior and inability to keep personal matters outside the workplace.

Accordingly, the burden returns back to Plaintiff to demonstrate that Defendant's proffered reasons were pretextual, concealing Defendant's true retaliatory motivation. Plaintiff may demonstrate this either by persuading the court that a discriminatory purpose more likely motivated the employer or by showing that the employer's proffered explanations are unworthy of belief. Texas Dept. of Comm'ty Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095, 67 L. Ed. 2d 207 (1981). Plaintiff must "come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (quotation omitted). For example, "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" could be demonstrated. Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotations and citations omitted).

This burden Plaintiff wholly fails to meet, as she does little more than restate her own conclusion that Defendant's action was retaliatory. As evidence of animus against her EEOC activity, Plaintiff generally cites her overall impression that she was being treated more poorly and labeled incompetent, and she states that her "environment was more and more controlled" (doc. 51-1 at 142–43). These are mere conclusory statements, devoid of context and without any overt connection to any retaliatory motive. See Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1236 (11th Cir. 2004) (pretext not shown despite employee's contention that there was an abrupt change in supervisor's opinion on her performance when record showed evaluations detailing concerns

about the deficiencies in employee's work); Parker v. Board of Ed., 403 F. App'x 477, 478 (11th Cir. 2010) (unpublished); Smith v. Quintiles Transnational Corp., 509 F. Supp. 2d 1193, 1204 (M.D. Fla. 2007); *see also* Financial Federated Title and Mize, *supra*; Barfield v. Brierton, 883 F.2d 923, 934 (11th Cir. 1989) ("If the nonmoving party's response consists of nothing more than a repetition of his conclusory allegations, the district court must enter summary judgment in the moving party's favor"). Plaintiff's proof amounts to a juxtaposition of her termination with the fact that she had an active EEOC complaint. That she experienced a general deterioration in her work environment does not establish by a preponderance of evidence that Defendant's thoroughly documented actions building toward her termination were pretextual. Her claim of retaliation is therefore unavailing.

IV.   CONCLUSION

Upon consideration of Plaintiff's claims and the evidence submitted, the court concludes that there exists no genuine issue of material fact, and that Plaintiff has failed to establish her claims under Title VII. Thus, as a matter of law, Defendant is entitled to judgment in its favor.

Accordingly, it respectfully **RECOMMENDED**:

1.   That the motion for summary judgment filed by Defendant Eric K. Fanning, as Secretary of the United States Department of the Air Force (doc. 50), be **GRANTED**.

2.   That judgment be entered by the clerk in favor of Defendants.

At Pensacola, Florida, this 5th day of March 2015.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

Any objections to these proposed findings and recommendations must be filed within **FOURTEEN (14) DAYS** of the date this Report and Recommendation is docketed. Any different deadline that may appear on the electronic docket is for the court's internal use only. A copy of objections shall be served upon all other parties. A response to any objections shall be filed within **SEVEN (7) DAYS** of the date the objections are filed, or on or before **MARCH 26, 2015**, whichever date is earlier. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).